# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

|  |  |
|---|---|
| JOSEPH LOMASCOLO, *et al.*<br><br>       Plaintiffs,<br><br>    v.<br><br>ALLTECH, INC., *et al.*<br><br>       Defendants. | Case No.:  1:08-cv-1310-AJT-JFA |

## DEFENDANTS' BRIEF IN RESPONSE TO LETTER OBJECTIONS TO SETTLEMENT AND IN FURTHER SUPPORT OF JOINT REQUEST FOR APPROVAL OF THE SETTLEMENT

Theresa Burke Wright, (VSB No. 30770)
Andrew S. Cabana, (VSB No. 48151)
Kara M. Ariail (VSB No. 46817)
Jackson Lewis LLP
10701 Parkridge Boulevard, Suite 300
Reston, VA 20191

Paul J. Siegel, (Admitted *Pro Hac Vice*)
Wendy J. Mellk (Admitted *Pro Hac Vice*)
JACKSON LEWIS LLP
58 S. Service Road, Suite 410
Melville, New York 11747
Telephone:  (631) 247 0404
Facsimile:  (631) 247 0417

*Counsel for the Defendants ALLTECH, Inc. and PARSONS BRINCKERHOFF INC.*

Defendants Parsons Brinckerhoff Inc. ("PBI") and ALLTECH, Inc. ("ALLTECH"), both of which collectively referred to as "Defendants", by their counsel, provide this brief in further support of the parties' joint request for judicial approval of the settlement reached in this matter, and in response to the letter objections to this Court submitted by opt-in Plaintiffs Bobby Hitchcock ("Hitchcock"), Kurt Armbrust ("Armbrust"), Ethan Marlatt ("Marlatt") Robert Evans ("Evans"), Ben Ryan ("Ryan") and Richard Coe ("Coe"), as well as the further objections submitted by named Plaintiff Joseph Lomascolo and opt-in Plaintiff Everett Sharp. See Docket Entries 177; 184-187; 189-190; 192-193.[1] Defendants previously responded to Named Plaintiff Lomascolo's unfounded objections and to the earlier letter submitted by Robert Evans, whose objection appeared resolved by permitting him to opt-in belatedly. See Docket Entries 164 (letter of R. Evans) and 180-2 (belated opt-in of Plaintiff Evans).

**INTRODUCTION**

The relevant procedural background of this collective action is laid out in, inter alia, Defendants' previously-filed "RESPONSE TO LETTER OBJECTIONS SUBMITTED BY NAMED PLAINTIFF LOMASCOLO AND BY ROBERT EVANS." See Docket Entry 166 ("Response I").[2] Following that submission, the parties appeared before

---

[1] Docket Entry 187, while apparently provided to the Court on or about May 1, 2009, was not entered by the Clerk's office until June 11, 2009, thus Defendants address it briefly here. The objections of Sharp and Coe (Docket Entries 192 and 193) were submitted to the Court after the June 10, 2009 deadline for such submissions contained in the Order, and Defendants object to them on that basis. See Docket Entry 168 (Any objections must be **received by the court** . . . by 5:00 p.m. on June 10,2009")(emphasis in original). They should be disregarded. Stevens v. Safeway, Inc., 2008 U.S. Dist. LEXIS 17119 (C.D. Cal. Feb. 25, 2008)(considering only the two timely objections to FLSA settlement involving 4000+ eligible plaintiffs); Romero v. Producers Dairy Foods, Inc., 2007 U.S. Dist. LEXIS 86270 (E.D. Cal. Nov. 13, 2007)(remarking in granting final approval to FLSA settlement that "as of the objection filing deadline, counsel for the parties are not aware of any objections"). Nevertheless, and without waiving their objection thereto, Defendants address them as well.

[2] Defendants incorporate that document by reference herein.

Magistrate Judge Anderson to address the fairness of the proposed settlement, including the issues discussed in that Response.  See Order of Magistrate Judge Anderson, dated May 8, 2009 (the "Order").  In the Order, Magistrate Judge Anderson directed Plaintiffs' counsel to provide the settlement agreement to all opt-in Plaintiffs (the "Plaintiffs") and to furnish the schedule of individual settlement benefits to be paid to Plaintiffs, as well as Plaintiffs' counsels' attorney's fees and costs.  Id.  The Order provided a deadline by which objections were due (June 10, 2009), and a deadline by which Defendants could respond to those Objections (June 17, 2009). It is Defendant's understanding that the Settlement Agreement, Amended Stipulation and list of negotiated individual settlement benefits were distributed to all Plaintiffs.

The pre-approval process having been completed, and with so few of the participating Plaintiffs having objected, Defendants submit this brief in response thereto and in further support of the settlement of this matter.  Simply put, the objections are meritless.  None challenges the settlement formula or payment amounts.  Instead, they seek relief outside the scope of this lawsuit (i.e., declaration of "employee" status under all laws and adjudication of retaliation claims not before the Court), which must be disregarded.

I.     **THE SETTLEMENT HAS NO DISADVANTAGE TO PLAINTIFFS OR PUTATIVE PLAINTIFFS: IT SETTLES AND EXTINGUISHES ONLY THE OVERTIME RIGHTS OF PARTICIPATING PLAINTIFFS FOR THE PERIOD AT ISSUE**

Contrary to statements made by named Plaintiff Joseph Lomascolo and opt-in Plaintiff Everett Sharp before this Court on May 8, 2009, as well as, inter alia, the assertions in the letter objections of Plaintiffs Marlatt, Armbrust, Sharp and others, this settlement does not extinguish the rights of Plaintiffs – or non-Plaintiff inspectors – under statutes or common law theories other than the Fair Labor Standards Act ("FLSA") and analogous state wage-and-hour

laws.   It does not adjudicate Plaintiffs to be independent contractors or deprive them of "benefits".   The proposed Settlement Agreement (the "Settlement") does <u>not</u> contain a general release or waiver of non-FLSA rights.   Thus, it has no effect on non-overtime issues – no disqualification from, or reference to, unemployment benefits or any other benefit!  No reference is made to, and there is no impact upon, claims of retaliation, prior tax determinations, tax status or the like.   To the contrary, the Settlement and proposed Stipulation expressly state that Plaintiffs are waiving only overtime and related wage claims.   Docket Entry 179 at p. 7, Settlement ¶ 1.7.

Also, the Settlement does <u>not</u> preclude inspectors who opted in to the lawsuit from receiving future FEMA-site assignments – the pre-lawsuit <u>status quo</u> regarding assignment of inspections continues to obtain, <u>i.e.</u>, inspectors are in ALLTECH's database and receive notice of potential FEMA-deployments based upon ALLTECH's business judgment, including ALLTECH's consideration of past inspection performance, productivity, demonstrated expertise, reliability, ability to interact well with the "dispatcher" and others, geographic suitability, etc. There is <u>no</u> blanket bar or disqualification to eligibility for deployments.   As noted, and addressing the concerns of the Objectors, the Amended Stipulation confirms the non-adjudication of retaliation claims.  <u>See</u> Docket Entry 179 at p. 7.

The retaliation allegations of, among others, Marlatt, Sharp, Armbrust, Ryan and other Objectors (discussed in Section V, <u>infra</u>) are not subject to adjudication in this case.  <u>See</u> Docket Entry 185 at p. 3; Docket Entry 186 at p. 2; Docket Entry 190 at p. 1.  No such claim was asserted in the Complaint.   Moreover, they, like other inspectors, have not been offered deployment of late because the volume of inspection work is low.   Marlatt opted-in to this lawsuit on February 26, 2009.  Docket Entry 153.  Armbrust opted in on February 25, 2009.

Docket Entry 152.   While their allegations about retaliation are wholly irrelevant to this proceeding (which, again, does <u>not</u> address retaliation), it should be noted that since February 25-26, 2009, ALLTECH has deployed approximately 102 inspectors from an active database of 5,246 (1.94%) to a mere eight sites.

While these few dissatisfied Plaintiffs raise a concern about retaliation (<u>see</u>, <u>e.g.</u>, Docket Entry 185 at 3) and seek to explain the low lawsuit joinder rate on that basis, there is no proof of their accusation.   Everyone who had the choice to join the lawsuit was free to make that decision and was advised of the opt-in protocol and consequences by the opt-in form.   Of the nearly 2,200 inspectors who received notice of this action, just 70 (3.2%) chose to join.   The lack of participation of more than 2,000 putative plaintiffs seems to reflect a lack of interest and also would seem to bear witness to their belief that they are independent contractors who run their own inspection businesses.

While Marlatt suggests that would-be Plaintiffs ran out of time to opt-in, the Court granted sufficient time, <u>i.e.</u>, <u>sixty days</u> to review Plaintiffs' counsel's mailing regarding the lawsuit and opting-in.   In fact, Defendants did not object to the late opting-in of several inspectors.   If other inspectors needed more time to consider whether to opt in, he or she should have requested it.   <u>Id</u>.   Several did so and a stipulation of belated joinder was negotiated.[3]   <u>See</u> Docket Nos. 180, 183.   Regardless, non-participants are <u>not</u> affected by the settlement.

Finally, as discussed below, the Settlement Agreement and Amended Stipulation do not vacate any adjudication or "victory" for Plaintiffs.   The Settlement provides for no final adjudication of employee status, independent contractor status, benefits rights, tax status or anything else.   Simply stated, the Court has not made a final adjudication under the FLSA and

---

[3] During this same period, eight individuals chose to withdraw their opt-in forms.  Defendant agreed to their request pursuant to F.R.C.P. 41.  None of the Objectors chose to withdraw.

the Complaint made no claim under any other law.  There has been no holding that any inspector

was exempt or non-exempt; was or was not an employee; was or was not due overtime pay; or

was or was not entitled to anything at all.  In sum, nothing has been addressed other than

resolution by settlement of the overtime pay issue before the Court.

## II.   THE SETTLEMENT DOES NOT IMPACT PURSUIT OF UNEMPLOYMENT COMPENSATION BY PLAINTIFFS OR ISOLATED ADMINISTRATIVE DERMINATIONS REGARDING UNEMPLOYMENT INSURANCE OR BENEFIT ENTITLEMENTS

Whether a party to this action or not, any inspector who applies for

unemployment benefits will have his or her claim considered by the appropriate agency where

the unemployment insurance claim is filed; not by this Court.  Unemployment compensation

claims are pending before State agencies; one recently was rejected based on a finding of

independent contractor status.  See Pennsylvania Unemployment Compensation Board of

Review ruling In the Matter of Robin White, dated March 19, 2009, at Docket Entry 166, Exhibit

B.  As Magistrate Judge Anderson noted during the May 8, 2009 hearing, these disparate

administrative proceedings are not at issue in this FLSA lawsuit.  None of those proceedings

addressed overtime pay entitlements.  In contrast, nothing relating to unemployment claims or

claims of any kind other than the overtime claim in this case is affected by this lawsuit.  As such,

those unrelated administrative proceedings do not militate against a finding of fairness and

enforceability of the settlement.[4]

If anything, Marlatt's and Ryan's objections reinforce the White ruling, which

found an inspector to be properly classified as an independent contractor.  Marlatt acknowledges

that inspectors cannot rely on Defendants to be their sole source of income.  Docket Entry 185 at

---

[4] It is unclear why Plaintiff Lomascolo attaches yet again the administrative determinations to his May 1, 2009 submission.  See Docket Entry 187.  Presumably, he read the prior submissions to this Court by his counsel, attaching and extensively referencing those same documents.

p. 2 ("no single inspector can rely on PB as the sole source of their income");[5] see also Objection of Armbrust, Docket Entry 186 at p. 2 (contractor relationship with Defendant is "frequently recurring during irregular intervals").  The objections go on to explain at length the skills that successful inspectors bring to bear in running their business, including knowledge of construction, computer skills and logistical skills.  Id.  Ryan describes the business of an inspector as lacking guarantees; Social Security participation; insurance or Company benefits; and, expense payments.

## III.   THE MANNER OF COMPUTATION OF OVERTIME UNDER THE SETTLEMENT IS FAIR AND EQUITABLE

As the Court is aware, inspectors were paid on a "piece rate" basis, receiving a pre-determined and often negotiated rate per inspection, which was memorialized in a Task Order for each deployment.  The agreed-upon per inspection rate was paid upon acceptance of the inspections by FEMA.

The Task Orders called for each inspector to limit inspections to a duration of one hour and mandated notification to ALLTECH if an inspection was going to take, in toto, (i.e., travel, preparation, interaction with the applicant for benefits and all other phases of the inspection process) in excess of 10% longer than one hour.  ALLTECH is aware of only one instance where an inspector notified the Company that he believed that the inspection would require more than one hour.  The inspector was told not to perform the inspection if that much time was needed.  Since ALLTECH required the inspector to obtain specific permission to perform the inspection if the inspector thought it would take more than an hour (a protocol similar to "exception reporting" of work time), and only one inspector did so on one occasion, it

---

[5] Marlatt attributes this erratic workflow to ALLTECH's "manipulation" of the location and frequency of work.  He is incorrect.  ALLTECH bases offers of deployment on many factors, including geography, nature of the disaster, quality of an inspector's work in terms of timeliness and efficiency, availability, etc.

is likely that inspections and inspection related services routinely took an hour or less (in fact, an experienced inspector, working in an area in which applicants lived near one another, could perform inspections in much less than an hour).

The Task Orders also called for each inspector to record work time associated with inspections.  Despite being directed to record work time, inspectors did <u>not</u> maintain records of hours worked.  None has produced such time records in this case (and none produced any to ALLTECH).  Presented with no time data from Plaintiffs (whether as to travel, planning, scheduling, talking with applicants for benefits, etc.), the parties were compelled to estimate. The formula agreed to by the parties for settlement purposes assigned an all inclusive "duration" of 1.4 hours for each inspection performed during the applicable limitation period.  This represented a 40% premium beyond the 1.0 hour-duration the inspectors agreed to in the Task Orders.  The premium is generous.  Pursuant to the settlement, a Plaintiff's total "hours worked" equaled the number of inspections performed multiplied by the 1.4 hours.

Daily overtime is not required by the FLSA.  Overtime entitlement on a work week, if any, was computed by dividing total compensation (<u>i.e.</u>, the agreed upon inspection piece rate x inspections performed) by total hours worked (total inspections in the work week x 1.4 hrs/inspection) to determine the FLSA "regular rate", and using one-half of that quotient to determine overtime premium pay per "hour" in a given work week.  This method of calculation is consistent with the DOL regulations governing piece rate overtime calculation.  <u>See</u> Section IV(B), <u>infra</u>.

There is no credible or clear objection to this formula.  <u>See</u> Docket Entry 185 at p. 3; Docket Entry 186 at p. 1.  The "14 hour day . . . previously . . . determined", to which

Lomascolo refers, does not exist, and, contrary to Marlatt's unsubstantiated assertions,[6] the Settlement does "take into account the full extent of . . . services", especially if one simply reads the Task Order.

A.    **The Settlement Fairly Accounts for All of Plaintiffs' Purported "Work Time"**

When an inspector is deployed to a Presidentially declared disaster site managed by FEMA, his or her hotel room (or recreational vehicle or other choice of residence) is his or her residence for the purposes of determining working time.  No one is compelled to rent any particular hotel or motel room or to stay at any particular site.  Costs are determined by the inspector who elects to incur them.  Once he or she selects a "residence," that site is his or her "home" for the deployment.  Under the Fair Labor Standards Act, time spent on call or in one's "residence" is <u>not</u> work time unless the inspector truly is working (<u>e.g.</u>, calling applicants for FEMA benefits to schedule appointments).  While an inspector is "Off Duty" he is free to utilize this time as he sees fit (<u>e.g.</u>, sleeping, watching television, eating, performing other work, socializing).  Waiting for incoming assignments is <u>not</u> work time.  29 CFR § 785.16 (Off Duty).

Similarly, the time spent commuting to the first inspection site of the day and "home" from the last inspection of the day is <u>not</u> work time because an individual "who travels from home before his regular workday and returns to his home at the end of the workday is engaged in ordinary home to work travel which is a normal incident of employment. *This is true whether he works at a fixed location or at different job sites*."  29 CFR § 785.35 (emphasis added); <u>Kuebel v. Black & Decker (U.S.) Inc.</u>, 2009 U.S. Dist. LEXIS 43846 at * 27-28 (W.D.N.Y. May 18, 2009)(commute time up to 60 minutes to and from varying job sites not

---

[6] Marlatt also expresses concern that he was not permitted to participate in merits discovery.  Docket Entry 185 at p. 2.  Avoiding the onerous, bilateral burden of class-wide merits discovery was, as is customary, a factor the parties considered which weighed in favor of entering into the Settlement Agreement.

compensable under FLSA).   Since "commuting time" is not required because it is not work time, the first and last inspection of each day could have been assigned only an hour under the Settlement (or less if the inspection took less time than the Task Order expected), rather than 1.4 hours.  Yet, the 1.4 hour/inspection negotiated amount was applied to these inspections.  This provided a twice-per-day bonus to Plaintiffs in the calculation of hours worked used to determine Settlement overtime payments.

In sum, time relating to inspections was set at 1.0 hour by the Task Order – the negotiated settlement added a 40% premium to this amount (with a .8/hours per day bonus).  No evidence has been adduced to demonstrate that this estimate generally and reasonably failed to account for work time.

**B.       For Settlement Purposes Only, Defendants Consented to Use of the Three-Year Statute of Limitation**

The statute of limitation for violations of the FLSA is two years from the date a cause of action accrues.  The limitation period is extended to three years only for "a cause of action arising out of a willful violation."  29 U.S.C. § 255(a).  It would have been *Plaintiffs'* burden to demonstrate willfulness by showing "[T]hat the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  DeBejian v. Atlantic Testing Lab., Ltd., 64 F. Supp. 2d 85, 92 (N.D.N.Y. 1999), citing McLaughlin v. Richland Shoe Co., 486 U.S. 128, 139 (1988).  There is no proof of such "reckless disregard" in this lawsuit.  Nonetheless, for settlement purposes only, and despite the absence of evidence of a willful violation, Defendants consented to use of the three-year statute of limitation associated with willful violations for the purpose of calculating individual settlement payments.  This concession constitutes another substantial benefit to the Plaintiff and further is indicative of the Settlement's fairness.

**C.      The "Half Time" Calculation of Overtime Is Appropriate for Individuals Paid a "Piece Rate" or "Job Rate"**

As set forth above, the settlement formula calculates the "regular rate" for the purpose of calculating overtime as total compensation divided by estimated hours worked.[7] Overtime premium pay is one-half of the regular rate (i.e., since the regular base or straight-time rate per inspection was paid, the half-time premium is all that is due).  The Department of Labor's regulations recognize that the "half time" calculation is the proper computation of overtime for individuals receiving a fixed rate per "piece" or per "job".  29 CFR § 778.111; 29 CFR § 778.112.[8]  Regardless of the characterization of an inspection as a separate "job" or as a single "piece" worked, this calculation is correct and fair, and is the calculation this Court would utilize in making an award of back pay.  If the opt-in Plaintiffs were employees of ALLTECH under the FLSA (which Defendants strenuously urge they are not), their overtime pay would be determined in this fashion.

**D.      Defendants' Waiver of the Motor Carrier Exemption**

As set forth in prior briefings, Plaintiffs arguably were subject to the motor carrier overtime pay exemption to the FLSA's overtime requirement and, as such, were ineligible for overtime pay even if they were found to be employees (which they are not).  While applicability of the exemption during various time periods would have been a subject of dispute between the parties, all inspectors potentially were covered by the Motor Carrier exemption until, at the very

---

[7] To compute overtime pay in an FLSA case, the parties and the Court first must arrive at the "regular hourly rate".  Adams v. Dept. of Juvinile Justice of New York City, 143 F.3d 61, 66-67 (2d Cir. 1998) ("In order to calculate an employer's FLSA compliance, wages must be expressed in terms of a regular hourly rate").

[8] 29 CFR § 112 provides that, "If the employee is paid a flat sum for a day's work or for doing a particular job, without regard to the number of hours worked in the day or at the job, and if he receives no other form of compensation for services, his regular rate is determined by totaling all the sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked. He is then entitled to extra half-time pay at this rate for all hours worked in excess of 40 in the workweek."

least, August 10, 2006, and potentially beyond.[9]  Compare Tidd v. Adecco USA, Inc., 2008 U.S. Dist. LEXIS 69825 (D. Mass. Sept. 17, 2008) with Brooks v. Halsted Communs., Ltd., 2009 U.S. Dist. LEXIS 45777 (D. Mass. May 26, 2009).  The risk to Plaintiffs of a zero recovery associated with this exempt status defense was addressed when the parties were arriving at the settlement formula.

**IV.   BECAUSE DIFFERENT PLAINTIFFS PERFORMED VASTLY DIFFERING NUMBERS OF INSPECTIONS WITHIN THE LIMITATION PERIOD, INDIVIDUAL RECOVERY VARIES GREATLY**

The amounts to be paid to individual Plaintiffs under the Settlement vary greatly due to highly individualized data concerning the number of inspections that each Plaintiff performed during the applicable limitation period (which was itself individualized based on each Plaintiff's personal "opt-in date") and the date(s) when he or she submitted inspections as completed.  Every Plaintiff – indeed every inspector – was paid for all inspections performed and accepted by FEMA.[10]

**V.   FURTHER RESPONSE TO THE CONTINUED, SPURIOUS OBJECTIONS OF NAMED PLAINTIFF LOMASCOLO, AND RESPONSE TO INDIVIDUAL OBJECTIONS OF OPT-IN PLAINTIFFS**

**A.   Objection of Plaintiff Lomascolo**

Plaintiff Lomascolo's submission of his own unemployment insurance compensation finding, the factual "findings" of which largely support Defendants' position, has no bearing on this case or enforceability of the Settlement Agreement.  While Lomascolo may

---

[9] The August 10, 2006 date is noteworthy because, regardless of the applicability of the exemption after that date, it was applicable during the post-Hurricane Katrina inspection period in early 2006, when many of the Plaintiffs in this case performed some, or all, of their inspections for ALLTECH.

[10] Plaintiff Chad Smith's e-mails to inspectors misrepresent not only the scope of this lawsuit (which, again, resolves and extinguishes only claims under the FLSA and similar state laws by the Named Plaintiff and the Opt-In Plaintiffs), but also the scale of potential individual recovery even if an opt-in Plaintiff were to prevail on their wage claims.  These theoretical damages, even should they be obtained, would not approach the "$4 million" Smith has estimated in one e-mail, or $300,000 as he wrote in another.

have obtained benefits (and, in contrast, Robin White did not receive benefits from that same agency), almost all of the "facts" purportedly found support a finding of contractor status[11] (as evidenced by the very same administrative agency's subsequent, contrary finding in <u>White</u>). Regardless, Lomascolo's unemployment benefits remain undisturbed.  His concern that the Settlement is not the "best settlement necessary to further pursue employee status" is misplaced and should be disregarded.

Plaintiff Lomascolo again asserts confusing and ill-defined objections to the very case that he commenced solely for overtime pay.  The Complaint made <u>no</u> other allegation or claim.  There is no proof that he or anyone else consistently worked a "14 hour day".  The time spent conducting each inspection never was determined for each inspector and is contradicted by the Task Order and by evidence previously provided to Plaintiffs' counsel, which shows a broad disparity in the amount of inspections per week.  Nothing in the data with respect to Plaintiff Lomascolo would indicate in any way that he actually worked a 14-hour workday (rather than perhaps being in his hotel room or elsewhere for a large part of any day, supposedly waiting for assignments to be offered to him).  The attached summary of the inspections conducted by Lomascolo demonstrates the relative paucity thereof.  <u>See</u> Exhibit A.  Rebutting his claim is the following interchange with the Court on May 8th:

> THE COURT: And from what I read, your concern is not the amount of the settlement agreement, but the effect that it might have on this employee status?

---

[11] This is especially true because Lomascolo, contrary to what he told the Unemployment Compensation ALJ, had the right to hire subcontractors per the Independent Contractor Agreement; could have advertised his independent business; was not required to attend training about the FEMA computer if he knew how to operate it; attended no on-site training, only a brief FEMA site-specific orientation; and, had to comply with FEMA's requirements.

> MR. LOMASCOLO:  That's correct.  The Agreement that counsel
>
> discussed with us for settlement is totally different than what the
>
> settlement agreement is written in the document.

Transcript of May 8, 2009 hearing at page 18.

Addressing the protest of Plaintiffs Sharp and Lomascolo demanding adjudication of their employee "status", Magistrate Anderson stated unequivocally:

> MR. SHARP:  And then we are just trying to get our employee
>
> status.  I realize I am telling you much more than you need.
>
> THE COURT:  No.  And Mr. Sharp, part of what the issue is here,
>
> is you know, this is a lawsuit having to do with basically overtime
>
> wage claims.  And those are the issues that are before the Court.

Transcript of May 8, 2009 hearing at page 23.

**B.**      **Since Hitchcock And The Other Objectors Seek Relief Outside the Scope of This Lawsuit, Their Requests Should Be Disregarded**

Plaintiff Bobby Hitchcock and his few fellow objectors object to the Settlement because it does not provide for "employee status."  As detailed in Response I (and Sections I and II hereof), the status of any Plaintiff (and any other inspector who contracts with ALLTECH) under statutes other than the FLSA is not at issue in this case.  See Complaint and Docket Entry 166 at pp. 5-8.   Again, the Court already made this limitation clear to Named Plaintiff Lomascolo and Plaintiff Everett Sharp at the May 8th hearing, explaining that this case is not a global adjudication of ALLTECH inspectors' "employment" status and is addressed solely to overtime pay claims.

Plaintiff Hitchcock indicates he is "unhappy" with the handling of this case by lead counsel Mr. Rick Kinnan, and accuses counsel of "misrepresenting the intent" of this lawsuit[12] and of keeping class members "isolated from each other." His letter provides no facts to support these alleged actions by Mr. Kinnan, the Engstrom firm, co-counsel Danz & Gerber or local Counsel Gary Mims of the Hall Sickels firm. To the contrary, the history of this case shows that Mr. Hitchcock is wrong. First, it appears that the Court-approved notice was sent to all potential claimants; few elected to participate. Second, no one was misled as to the nature of the claim. The Complaint was clear – only overtime pay was sought. Third, counsel for Plaintiffs achieved conditional certification of this lawsuit, overcoming earlier denial of that motion. Fourth, Plaintiffs' counsel presided over dissemination of Notice (sending information about this case to a list of over 2,100 inspectors), negotiated the Settlement, negotiated an Amended Stipulation clarifying that claims other than overtime and wage claims were not covered and provided information about the Settlement to Plaintiffs. Fifth, Plaintiffs' counsel also negotiated the belated participation in this action of opt-in Plaintiffs: Richard Allen Coe, Marian Kay Coe, Kathy Mowery, Robert Evans, Timothy Finn and Roderick Russell. Sixth, Plaintiffs' counsel negotiated a limited (not general) release.

### C.    Objection of Robert Evans

The Letter of Objection filed by Robert Evans is perplexing and should be disregarded. Mr. Evans belatedly asked to join this case after the Court-ordered deadline, contending that he had not received the Notice of Pendency. Following the May 8th hearing, Mr. Evans was permitted to join the lawsuit. Mr. Evans presumptively did so with full knowledge of the Settlement Agreement signed on April 6, 2009 and the limited nature of the lawsuit, in which

---

[12] Plaintiff Hitchcock believes the intent of this case to be pursuit of a determination which will "declare inspectors employees" of Defendants for various purposes.

Plaintiffs sought solely overtime compensation in their Complaint.   Mr. Evans chose to participate in, and did not choose to resign from, this case, with knowledge that the Amended Stipulation explicitly preserved all rights that he might have other than claims with respect to compensation.  Thus, his objection should be disregarded.  While he may consider the Settlement Agreement to be "a one-sided document", Mr. Evans' opinion is due no weight.

As to Evans' other "points," the Court should reject his objections (like those of his few fellow objectors) because Named Plaintiff Lomascolo and Plaintiffs' counsel negotiated a limited release, rather than a general release, which was of clear benefit to Plaintiffs.  Second, neither the Settlement Agreement nor the Stipulation bar claims of any sort nor purport to settle claims unrelated to the wage and overtime pay claim asserted in the Complaint.  Third, neither federal or state labor laws nor tax laws (other than wage and overtime pay claims) are subject to adjudication in this case.  Fourth, very few of almost 2,200 inspectors chose to join this lawsuit and, of the approximately 75 that did so, very few are choosing to object.

### D.   <u>Objection of Kurt Armbrust</u>

With respect to Plaintiff Armbrust, his inability to pass a background check (which is required by the Department of Homeland Security and FEMA to conduct inspections at Presidentially declared disaster sites) resulted from his own actions, not those of Defendants.  Nothing about "credit problems" or a "background check" is subject to adjudication in this case, which is solely about overtime pay.  Second, as repeatedly noted above, the vaguely alleged "retaliation issue" raised by Armbrust and his fellow objectors is not the subject of this lawsuit (which the Court explicitly stated at the May 8th conference).  If Plaintiff Armbrust wishes to

assert an individual non-overtime pay claim in a separate personal suit, that is his choice.[13]

Third, no federal labor law addresses a "living wage" under the Fair Labor Standards Act, which

regulates only minimum wage and overtime payments.  This is, at its heart, an overtime pay

lawsuit and the Settlement addresses overtime pay claims.  Fourth, Armbrust did not seek a

change in the class representative or raise issues concerning collective action counsel—or

anything else—until now.  He certainly had the option not to join this action and to voice his

opinion at anytime, yet he chose not to do so.  Plaintiff Armbrust's lack of diligence and his

inaction are fatal to his objections.  None of his objections are valid; all should be rejected.

### E.    Objection of Ethan Marlatt

Like those of his co-objectors, Plaintiff Marlatt's question "what exactly are we

settling?" was answered on May 8th by the Court:  wage and overtime pay claims under the Fair

Labor Standards Act.  No other claims are being settled and no one is settling anything unless he

or she elected to opt in to this FLSA suit.[14]  Second, contrary to what Plaintiff Marlatt alleges,

the issue of whether Plaintiffs could prove they are employees rather than independent

contractors has been hotly contested by the parties.  Disagreements  with respect thereto, as well

as applicability of the motor carrier exemption; the amount of time truly worked performing

inspections; the inspectors' lack of proof of the time they worked; and, related issues, were all

---

[13] With respect to Plaintiff Armbrust's allegations of being forced to return equipment, all inspectors received the same notice Armbrust received, due to a needed upgrade to the software.  ALLTECH began to re-issue the equipment under this upgrade but stopped because of a pending release of a security update to the software.  As of this submission ALLTECH still is waiting for the update.  All equipment in the field will need to be exchanged when the software upgrade becomes available.

[14] As noted in fn. 3, supra, upon the parties' joint agreement, the following former opt-in Plaintiffs chose to voluntarily dismiss their claims; a joint stipulation to that affect was executed:  Connie Joslin-Culver (Docket Entry 169); Kurt Cordner (Docket Entry 170); Dennis Culver (Docket Entry 171); Kevin Fuqua (Docket Entry 172); Elise Keaton (Docket Entry 173); Elaine Libby (Docket Entry 174); Ira Simmons (Docket Entry 175); Rick MacAllister (Docket Entry 178).

factors when settlement was negotiated.  In any settlement discussion there is give-and-take; no

one is ever fully happy and no one gets all that he or she wants.

      Third, Marlatt's own letter contains evidence of independent contractor status,

including representations as to the inspectors arranging their individual scheduling to achieve

prompt turnaround; their prerequisite knowledge of construction trades (i.e., foundations,

framing, electrical and plumbing, etc.); their personal possession of computer skills necessary to

complete assignments; their individual ability to interpret and apply complex inspection

guidelines; their ability to communicate with others regarding adherence to those guidelines;

demonstrated "customer service" skills needed to deal fairly and effectively with applicants for

benefits, who represent a broad cross-section of residents from various cultural and socio-

economic backgrounds (and the ability to do so at a time when many have suffered catastrophic

loss of life or property); their possession of skills necessary to survive in dangerous and

contaminated environments; and their willingness to work "extremely long hours;" and other

facts, all of which should lead to, a finding that the inspectors are contractors.

      Fourth, nothing in the lawsuit, the Settlement Agreement or the Amended

Stipulation waives potential individual retaliation claims.  To the contrary, the Amended

Stipulation expressly states that no claim of retaliation is waived.  Fifth, a temporal duration

must be assigned per inspection for calculation of the regular hourly rate for overtime purposes

under the FLSA, since the time varied and was set by the Task Order.  Sixth, no "per diem" is

payable to any inspector.  Wherever one chooses to sleep during a deployment, however one

chooses to eat (whether to cook one's own meals or eat purchased food); whatever other

arrangements any inspector chooses; and the costs to be incurred are each inspector's own

decision.  Similarly, neither ALLTECH, nor PBI, directed any Plaintiff as to how he or she

should maintain insurance, pay taxes, arrange to be away from home for an extended period of time (if at all), arrange to pay for cell phone bills or anything else.  All was left to the inspector to decide as an independent contractor, who typically makes such decisions.

Seventh, discovery was discontinued because the case settled.  Nothing in Marlatt's written discovery responses would have changed the scope of the lawsuit or provided proof as to any other opt-in claimant.  In effect, Plaintiff Marlatt's objection supports Defendants' position that this case is subject to highly individualized proof, which militates against collective action status and in favor of decertification of the collective action.  Finally, when Marlatt received the opt-in materials is not known to Defendants.  Marlatt has not contended he lacked time to consider his decision.  He filed within the Court-set opt-in period.

F.      **Objections of Everett Sharp**

Plaintiff Sharp has raised no issue of substance.  He continues to also seek an "admission of liability", an unreasonable demand that never will be satisfied.  Sharp also ignores the Court's unequivocal statement of the limited scope of this suit.  Transcript of May 8, 2009 hearing at, inter alia, page 23.  Sharp continues to insist along with named Plaintiff Lomascolo that this Settlement "will sever everyones [sic] right to all benefits due them as an employee." See Doc. 187.  (April 30, 2009, email from named Plaintiff Lomascolo to plaintiffs' counsel, copied to Sharp).  His conclusion is incorrect and is contrary to the Settlement Agreement, the Amended Stipulation and the Complaint itself.  His allegations regarding plaintiffs' counsel are without merit.  See Section V(B), supra; see also Docket Entry 194.  Finally, his concerns regarding the Settlement formula are misplaced and have no basis in fact or FLSA law, as set forth in Section IV, supra.  Again, contrary to Sharp's June 13, 2009 letter, the issue of alleged retaliation was not litigated in the case and was not alleged in the Complaint.  Finally, Mr. Sharp

misunderstands the nature of a settlement.  Defendants consider him to be a subcontractor.  Yet, he is receiving a settlement payment.

### G.    Objection of Ben Ryan

Plaintiff Ryan's letter makes similar unsubstantiated reference to "irregularities in reference to the management and litigation of this case" and expresses his mistaken belief that the "IRS has made the determination [that] inspectors were/are employees."  Docket Entry 190 at p. 1.  For all the reasons previously expressed, these statements should be disregarded.

Incredibly, Plaintiff Ryan also alleges that he has been "'blackballed' . . . after this lawsuit."  Id.  Plaintiff Ryan conveniently conceals the fact that he has not performed any inspection for ALLTECH since July of 2006.[15]  Plaintiff Ryan opted in to this case on February 25, 2009 (Docket Entry 151), nearly three years after he last performed worked for ALLTECH.  It is impossible to correlate his lack of work with participation in a lawsuit filed almost three years after that work concluded (and outside the FLSA's usual two-year limitation period).  See Hill v. Kempthorne, 577 F. Supp. 2d 58, 66 (D.D.C. 2008)(alleged adverse action that occurred two months prior to protected activity "cannot in any sense constitute reprisal for the protected activity").  Indeed, the California deployment referenced by Ryan occurred in November 2008, more than three months before his opt-in date.

### H.    Objection of Richard Coe

Plaintiff Coe, like Plaintiff Evans, was permitted to join this case after the Court-imposed deadline.  See Docket Entry 180.  For all the reasons urged in Section V(C) and in

---

[15] Similarly, Plaintiff Lomascolo last performed an inspection for ALLTECH in October 2006.  Plaintiff Sharp has not performed any inspection since July 2008.  In fact, of the 72 current Plaintiffs, 69 (95.8%) of them performed no inspections in 2009.  The fact that a Plaintiff has not performed inspections since opting into this case in February of 2009 is not probative of anything other than the decreased volume of inspection work.

regard to the other Objectors, Coe's objection should be disregarded.  For the reasons already discussed, his objection regarding "determination of employee status" should be rejected as well.

*      *      *

None of the objections and none of their objections challenge the following:

a.     Plaintiffs lack precise proof of the time they actually conducted inspections, necessitating an estimating process;

b.     Defendants recorded properly the inspections conducted by each inspector that were accepted by FEMA;

c.     The Task Order explained clearly that each inspection (including travel, documentation, interactions with applicants for benefits and <u>all</u> related services or activities that possibly could be considered work time) should take no more than one hour;

d.     If an inspection were to require in excess of ten percent over one hour, the Task Order directed that an inspector should <u>not</u> conduct the inspection without permission.  Of all of the inspections that were conducted, only one inspector on one occasion provided such notice.  He was told not to conduct the inspection;

e.     The agreed upon 1.4 hours per inspection is a reasonable settlement amount, which none of the Plaintiffs dispute;

f.     A bonus of .8 hours per day was paid because "commuting" time was not work time;

g.     As part of the settlement, Defendants agreed to provide a third-year of limitation and not to apply the motor carrier exemption; and,

21

h.    The Complaint and the lawsuit address only overtime pay, not "employee" status, retaliation or other claims.

\*                 \*                 \*

In sum, the Settlement Agreement should be approved, the Amended Stipulation should be enforced and this case should be dismissed.

Respectfully submitted,

**JACKSON LEWIS, LLP**

By:   /s/ Andrew S. Cabana
Theresa Burke Wright, (VSB No. 30770)
Andrew S. Cabana, (VSB No. 48151)
Kara M. Ariail (VSB No. 46817)
Jackson Lewis LLP
10701 Parkridge Boulevard
Suite 300
Reston, VA 20191
(703) 483-8300 – Telephone
(703) 483-8301 – Facsimile
cabanaa@jacksonlewis.com
wrightt@jacksonlewis.com
ariailk@jacksonlewis.com
*Attorneys for Defendants*
*PARSONS BRINCKERHOFF INC., and ALLTECH,*
*INC.*

-and-

By:   /s/ Paul J. Siegel
Paul J. Siegel (admitted *pro hac vice*)
Wendy J. Mellk (admitted *pro hac vice*)
Jackson Lewis LLP
58 South Service Road, Suite 410
Melville, NY  11747
(631) 247-0404 – Telephone
(631) 247-0417 – Facsimile
siegelp@jacksonlewis.com
mellkw@jacksonlewis.com

*Attorneys for Defendants*
*PARSONS BRINCKERHOFF INC., and ALLTECH,*
*INC.*

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on June 17, 2009, a copy of the foregoing <u>DEFENDANTS'</u> <u>BRIEF IN RESPONSE TO LETTER OBJECTIONS TO SETTLEMENT AND IN FURTHER</u> <u>SUPPORT OF JOINT REQUEST FOR APPROVAL OF THE SETTLEMENT</u> was filed with the Court by electronic means; opposing parties and the Court were served consistently with the instructions therein.

By:   <u>/s/ Andrew S. Cabana</u>
        Andrew S. Cabana, (VSB No. 48151)
        **JACKSON LEWIS LLP**
        10701 Parkridge Boulevard
        Suite 300
        Reston, VA 20191
        (703) 483-8300 – Telephone
        (703) 483-8301 – Facsimile
        cabanaa@jacksonlewis.com
        *Attorney for Defendants*
        *PARSONS BRINCKERHOFF INC., and*
        *ALLTECH, INC.*

I:\Clients\P\17165_KJC\118044-FLSA\Pleadings\E.D.VIRGINIA\Response to Objections 06-17-09 FINAL.doc